**Patricia Gayle TOOMEY, Petitioner–Appellant,**

v.

**Sue CLARK, Superintendent of the Washington State Corrections Center at Purdy; Kenneth O. Eikenberry, Attorney General of the State of Washington, Respondents–Appellees.**

No. 87–4350.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 11, 1989.

Decided June 8, 1989.

---

Timothy K. Ford, Seattle, Wash., for petitioner-appellant.

Linda A. Dalton, Asst. Atty. Gen., Olympia, Wash., John M. Jones, Asst. Atty. Gen., Dept. of Corrections, Olympia, Wash., for respondents-appellees.

Before WRIGHT, TANG and WIGGINS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Patricia Gayle Toomey, a Washington prisoner, appeals the district court's denial of her habeas corpus petition without an evidentiary hearing. She contends that the juvenile court's consideration of her pregnancy in its decision to decline jurisdiction violated her equal protection rights. We affirm.

## BACKGROUND

Washington charged 16–year–old Toomey with first degree felony murder and conspiracy to commit robbery. She was tried as an adult and convicted. The Washington Court of Appeals stated succinctly the facts underlying her conviction:

> Duane Dudley enlisted 16–year–old Patricia Toomey to help him rob a sailor, using a gun. The scheme went horribly awry; Dudley killed the victim. The juvenile court declined jurisdiction and Toomey, tried as an adult, was convicted of first degree murder. . . .
>
> It was Toomey who first gave police the details of the crime. Dudley, she said, asked her to come with him because "I'm a girl and I can always lure them." He also asked her to carry his gun in her purse. They spent several hours looking for a victim. Finally, about 1:30 a.m., they managed to lure Gerald Marzulli into an alley on the pretense of making a drug sale. Toomey slipped Dudley the gun and pretended to go off to get the merchandise. Dudley thought he saw a badge in Marzulli's wallet and was about to be arrested. He shot Marzulli. A few minutes later, on a prearranged signal, he rejoined Toomey and told her what he had done. On the basis of Toomey's admissions and corroboration by others, both she and Dudley, also a juvenile, were arrested and referred to the juvenile court.

State v. Toomey, 38 Wash.App. 831, 832–33, 690 P.2d 1175, 1177–78 (1984) (footnote omitted), cert. denied, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 501 (1985).

The juvenile court conducted an extended declination hearing. In light of the criteria set forth in Kent v. United States for waiving jurisdiction,[1] it heard testimony

---

1. In Washington, a juvenile court after a hearing may transfer a case for adult criminal prosecution upon finding that the declination would be in the best interest of the juvenile or the public. Wash.Rev.Code Ann. § 13.40.110(2) (West Supp.1989). Its decision to decline jurisdiction is discretionary and subject to reversal only if exercised upon a ground clearly unten-

from many witnesses on Toomey, her role in the alleged offense, her family background and personal history, the prospect of her rehabilitation in the juvenile system, and other relevant factors.

At the conclusion of the hearing, the court held that although retaining juvenile court jurisdiction would serve Toomey's best interests, the best interests of society and the protection of the community required declination. It based that decision primarily upon "the seriousness of the offense, the apparent sophistication of the juvenile and the less than ideal situation for treatment and rehabilitation." Among other factors, the court found:

> [t]hat the possibility of successful treatment and rehabilitation of PATRICIA G. TOOMEY within the juvenile system is diminished by the fact of her pregnancy. Although Echo Glen and the juvenile system have facilities such that PATRICIA G. TOOMEY could give birth to her child within the juvenile system, the issues involved in either the termination of her parental rights or her involvement in programs designed to increase her parental ability will hamper and distract her ability to deal with the problems outlined in Finding of Fact XVI [describing Toomey's drug abuse and emotional problems].

The court's reliance on the problems generated by Toomey's pregnancy is the basis of her equal protection claim.

Tried as an adult, Toomey was convicted by a jury and sentenced to life imprisonment for first degree felony murder and ten years' imprisonment for conspiracy to commit robbery. She appealed to the Washington Court of Appeals, which rejected her equal protection claim and affirmed the juvenile court's declination order and her conviction. *See Toomey,* 38 Wash.App. at 836–38, 690 P.2d at 1180. The Washington Supreme Court denied review, *Toomey v. State,* 103 Wash.2d 1012, (1985), and the United States Supreme Court denied her petition for certiorari, *Toomey v. Washing-*

ton, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed. 2d 501 (1985).

Toomey filed a 28 U.S.C. § 2254 habeas corpus petition. After reviewing the state record, the magistrate issued a report rejecting her claims and recommending that the court dismiss the petition without an evidentiary hearing. The district court approved his report and dismissed the petition.

## STANDARD OF REVIEW

We review *de novo* the district court's decision to deny a habeas corpus petition. *Lincoln v. Sunn,* 807 F.2d 805, 808 (9th Cir.1987). Our review of a petition denied without an evidentiary hearing involves a two-part inquiry. First, we must determine whether Toomey has alleged facts that, if proved, would entitle her to relief. If she did, we must determine whether an evidentiary hearing is necessary to establish the truth of her allegations. *Id.; see Townsend v. Sain,* 372 U.S. 293, 312–19, 83 S.Ct. 745, 756–60, 9 L.Ed.2d 770 (1963) (discussing circumstances when a reviewing federal court must grant an evidentiary hearing to a habeas applicant). We may not affirm a district court's denial of a petition without a hearing unless the record shows that it independently reviewed relevant portions of the state court record. *Lincoln,* 807 F.2d at 808; *Richmond v. Ricketts,* 774 F.2d 957, 961 (9th Cir.1985).

## DISCUSSION

Toomey contends that the court's declination decision violated her equal protection rights "because it was explicitly based on the fact that she was a pregnant female, and because the State of Washington has not taken minimal steps to accomodate [sic] pregnant females in its juvenile system." She asks this court to remand for an opportunity to develop the evidence supporting her discrimination claim. Specifically, she

---

able or manifestly unreasonable. *Toomey,* 690 P.2d at 1178. It, however, must comply with certain due process requirements. *Kent v. United States,* 383 U.S. 541, 553, 86 S.Ct. 1045, 1053,

16 L.Ed.2d 84 (1966); *State v. Holland,* 98 Wash. 2d 507, 515–16, 656 P.2d 1056, 1061–62 (1983) (list of factors a juvenile court should consider before waiving jurisdiction).

asks for an evidentiary hearing on whether the state has failed to take minimal steps to accommodate pregnant females in its juvenile system and whether consideration of pregnancy in a juvenile declination decision serves any legitimate state interest.

I

Toomey did not allege generally that Washington's juvenile courts are less likely to retain jurisdiction over female juveniles than male juveniles. Thus, the narrow question presented is whether the juvenile court discriminated against Toomey by considering her pregnancy in declining jurisdiction. We must determine whether that consideration constituted gender-based discrimination on its face. If not, we must determine whether the court's reliance on her pregnancy reflected invidious gender-based discrimination.[2] *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979).

### A. *Did Consideration of Pregnancy Constitute Sex Discrimination on its Face?*

The Supreme Court has had difficulty finding unlawful gender discrimination when the basis for disparate treatment is pregnancy. It has justified explicit gender discrimination because only women can become pregnant. *See Michael M. v. Superior Court*, 450 U.S. 464, 470, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (upholding a state statute that punished only males for statutory rape by finding that the statute advanced a reasonable state interest: limiting illegitimate teenage pregnancies). However, it has not necessarily treated pregnancy as defining a gender-based classification under the Equal Protection Clause.

In *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Court considered an equal protection challenge to a state disability insurance system that excluded pregnancy from coverage. It held that the exclusion did not constitute discrimination under equal protection analysis and found that the state had a rational reason for excluding pregnancy. *Id.* at 494–97, 94 S.Ct. at 2490–92. Dismissing the issue of gender discrimination in a footnote, it said:

> While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification.... Normal pregnancy is an objectively identifiable physical condition with unique characteristics. *Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other*, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

*Id.* at 496–97 n. 20, 94 S.Ct. at 2492 n. 20 (citations omitted and emphasis added).

The Court extended this analysis to a similar case under Title VII. *See General Elec. Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In construing Title VII, it denied relief to female employees whose disability plans did not include pregnancy by finding that the exclusion of pregnancy from coverage under the state plan was not itself discrimination based on sex. *Id.* at 135, 97 S.Ct. at 407.

In *Nashville Gas Co. v. Satty*, 434 U.S. 136, 142–43, 98 S.Ct. 347, 351–52, 54 L.Ed.2d 356 (1977), the Court held that an employer's mandatory maternity leave program that forced a woman to take formal leave without pay and resulted in a loss of seniority constituted sex discrimination under Title VII. It distinguished the case from *Geduldig* and *Gilbert* by noting that

---

**2.** If the court's decision constituted sex discrimination, we must apply a "heightened" standard of review. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440–42, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). Under that standard, the government has the burden of establishing that such classifications are based on differences between the sexes that bear a substantial relationship to an important governmental objective. *See, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).

the mandatory leave policy imposed a substantial burden on women. *Id.* at 142, 98 S.Ct. at 351.

In response to the *Geduldig* and *Gilbert* decisions, Congress enacted the Pregnancy Discrimination Act of 1978, amending Title VII to include pregnancy classifications within the statutory definition of sex discrimination. That Act in effect overruled *Gilbert. Newport News Ship Bldg. & Dry Dock Co. v. EEOC,* 462 U.S. 669, 670, 103 S.Ct. 2622, 2624, 77 L.Ed.2d 89 (1983). Therefore, the Court has conceded that, for statutory purposes, "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* at 684, 103 S.Ct. at 2631.

Although the Court has held that discrimination based on pregnancy is sex discrimination under Title VII, that conclusion does not necessarily preclude courts from treating pregnant women differently. Under equal protection cases, such classifications are not gender based. *Geduldig,* 417 U.S. at 496–97 n. 20, 94 S.Ct. at 2492 n. 20; *see Newport News,* 462 U.S. at 677, 103 S.Ct. at 2628 (distinguishing Title VII discrimination analysis from the equal protection standard set forth in *Geduldig* ). The juvenile court's decision to decline jurisdiction over Toomey based partly on her pregnancy was not, on its face, sex discrimination.

B. *Did the Court's Decision Constitute Invidious Gender–Based Discrimination?*

■ "If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination." *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293; *see Geduldig,* 417 U.S. at 496 n. 20, 94 S.Ct. at 2492 n. 20.

To prevail on a sex discrimination claim under this second theory, Toomey must show that the court's consideration of her pregnancy had a discriminatory effect and

that it acted with discriminatory intent or purpose. *See McCleskey v. Kemp,* 481 U.S. 279, 292–93, 107 S.Ct. 1756, 1766–67, 95 L.Ed.2d 262 (1987); *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293; *De La Cruz v. Tormey,* 582 F.2d 45, 51 (9th Cir.1978), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." [3] *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296 (footnote omitted).

We must determine whether the court intended to discriminate against Toomey because of her sex. Having reviewed the state record, the district court found absolutely no support for her claim. We agree that elements of an intentional sex discrimination claim are not present in this case.

Toomey contends that the court's consideration of her pregnancy was based on the state's alleged failure to accommodate pregnant juveniles. She contends that alleged failure reflects a pattern of discrimination under which Washington denies juvenile females facilities and treatment equal to those provided for juvenile males. She further argues that had the state taken minimal steps to accommodate, the juvenile court would have had no basis to decline jurisdiction over her.

Toomey bases those allegations on testimony presented by juvenile probation officer, David Corn, at the declination hearing. He testified that the juvenile system did not have the time to rehabilitate Toomey effectively and stated:

I was told by the Division of Institutions when I talked with them about Patricia's case and her particular problem with the law and trying to—in trying to ascertain what they would do with a case like this were they to get it, one of the first things they told me simply was that they

3. We must decide whether the court based its decision deliberately on an unjustifiable, group-based standard. *See Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293 ("impact provides an 'important

starting point,' but purposeful discrimination is 'the condition that offends the Constitution' ") (citations omitted).

were not equipped to deal with a pregnant teen-age girl.

Noting that Corn's testimony raised doubts about the state's ability to handle pregnant juveniles, Toomey claims that an evidentiary hearing is necessary to determine whether Washington has failed to accommodate pregnant females in its juvenile system.

The district court, however, found her suggestion "clearly meritless in that lack of appropriate facilities has not been demonstrated anywhere in the record nor in the documents submitted to the court." It noted that express testimony demonstrated that the state's juvenile facility at Echo Glen had the facilities necessary to accommodate pregnant females. A court-appointed clinical psychologist, Barbara White Davis, testified that the state's juvenile system was accustomed and equipped to handle pregnant girls.[4] Further, Corn later clarified his testimony stating that juvenile parole officials had told him they would work with community agencies to provide those juveniles with appropriate facilities and treatment. Based on that testimony, the juvenile court found that the state's juvenile system *had* adequate facilities to accommodate a pregnant female.[5] There is no evidence that it declined jurisdiction even in part because of the state's

alleged inability to accommodate. In its oral declination decision, the court provided:

> It is undeniably true, and the court takes it to be true, that Echo Glen and the juvenile justice system have the facilities available to allow her to give birth to this child within the confines of the system. The court does not perceive that to be a particularly logistical problem, but once a person becomes a parent given polysubstance abuse problems, given passive/dependent personality problems and cyclothymic disorder problems, dealing with being a parent causes some problems, also.... I cannot help but conclude that what's going to happen with Patricia and this child, whether it be a termination through the juvenile court or whether it's going to be getting parenting education and skills, is going to cloud and distract from dealing with substance abuse, passive/dependent personality, and cyclothymic disorders.

Contrary to Toomey's contentions, the court did not consider her pregnancy because of any lack of facilities. Instead, it considered her pregnancy only in its evaluation of the likelihood of reasonable rehabilitation, given her serious personality disorders and drug abuse problems.

---

4. Before the juvenile court, she testified in part:

Q: [By Prosecutor] In your discussion with Ms. Nicholas [a juvenile rehabilitation counselor at Echo Glen, the facility where Toomey most likely would have been assigned within the juvenile system], what did she indicate to you regarding pregnancy of Ms. Toomey if she were—if Ms. Toomey were to be committed to Echo Glen?

A: Right. That they have had pregnant teenagers before. BJR, that's Bureau of Juvenile Rehab, has had a policy with Faith Homes in Tacoma to deal with pregnancies and deliveries there. They do have, they would be able to cover the options that [Toomey] would face regarding the pregnancy and possible decisions to be made and the delivery if the person is considered a run risk or is not doing very well or for some reason the delivery can take place there in the infirmary, although they prefer to have her somewhere else.

\* \* \* \* \* \*

Q: Did she see any problem with having a pregnant woman—girl admitted to Echo Glen?

A: It would not be the first time. They have coped with it before.

Q: And she had—there's an established procedure for doing that, correct?

A: I suppose that the personal needs of the person would dictate the procedure somewhat. It's not a norm that occurs.

Q: Did Ms. Nichols indicate to you whether counseling would be made available for the pregnancy?

A: Regarding pregnancy and family planning?

Q: Yes.

A: Yes.

Davis, however, did not know whether Echo Glen had a program for females placed within the juvenile system who have a young child.

5. After reviewing relevant portions of the record, the district court determined that the juvenile court's finding was correct. *See* 28 U.S.C. § 2254(d) (statutory presumption of correctness); *Richmond v. Ricketts,* 774 F.2d 957, 961–62 (9th Cir.1985) (district court reviews findings to determine if presumption applies). We agree.

■ We reject the suggestion that the district court must afford Toomey an evidentiary hearing on the question whether the state has failed to accommodate pregnant juveniles in its system. Because the juvenile court did not rely on that contention to decline jurisdiction, the alleged factual dispute is not "crucial to the adequate consideration of the constitutional claim."[6] *See Townsend v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). Any failure to accommodate would have had no discriminatory effect on the declination decision.

Further, the court did not rely only on the potential problems generated by Toomey's pregnancy in determining whether to waive jurisdiction. Instead, the district court found that the juvenile court took all of the *Kent* standards into account and concluded that its declination decision was thoughtful and well reasoned. *See Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 270 (1966) (factors to consider in waiving juvenile jurisdiction); *see also* Wash.Rev.Code Ann. §§ 13.40.110–13.40.-440 (West Supp.1989) (Washington's Juvenile Justice Act of 1977). The juvenile court considered:

> the severity of the charged offense, the degree of the petitioner's alleged involvement, the petitioner's degree of sophistication and maturity, then constancy of her home life, her emotional attitude, her life style, her lack of past criminal record, the failure of various social programs in which the petitioner had been involved, the length of time for which the juvenile court could maintain jurisdiction over the petitioner, her history of drug and alcohol abuse and personality disor-

der, and the likelihood of treatment and rehabilitation.

Our review of the record confirms that it considered the *Kent* criteria carefully and judiciously. Toomey's contention that the state's failure to accommodate pregnant juveniles provided the only basis for the court's declination of jurisdiction is specious.

Finally, we note that the record does not necessarily support the argument that the court's consideration of pregnancy had a "discriminatory effect" on the declination decision. It is unclear whether the court would have retained jurisdiction over a similarly situated nonpregnant juvenile.[7] This is not a case in which pregnancy mandates declination. The court here conducted an individualized analysis of the *Kent* factors to conclude that given all the circumstances, the public's best interests required declination. The record shows that the court waived jurisdiction for several reasons, only one of which involved Toomey's prospects for rehabilitation in light of her pregnancy.

We conclude that the court's consideration of pregnancy did not reflect invidious discrimination. The court's finding that the juvenile system could accommodate pregnant females and its thorough review of the *Kent* factors support this court's dismissal of Toomey's equal protection claim.

## II

■ Alternatively, Toomey contends that the declination decision violates her equal protection rights because the court's consideration of her pregnancy is not rationally related to any legitimate state interest.

6. The alleged factual dispute would not be "material" to Toomey's equal protection claim. Her argument is based on the discriminatory intent of the juvenile court in its declination decision. That court concluded that the juvenile system could accommodate pregnant females. Any factual dispute of whether the state actually could accommodate pregnant females is irrelevant because the juvenile court did not base its decision on those alleged facts. There is no evidence of invidious discriminatory intent.

7. Compare this factual situation to that in *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). In *Palmore,* the Supreme Court held that the state court violated a mother's equal protection rights by awarding custody of her child to the father on the ground that she had a relationship with a black man. *Id.* at 434, 104 S.Ct. at 1882. The Court noted that it was "clear that the outcome would have been different had [the mother] married a Caucasian male of similar respectability." *Id.* at 432, 104 S.Ct. at 1881.

She argues that the district court erred in dismissing her habeas corpus petition without holding an evidentiary hearing on whether there is a rational relationship between pregnancy and rehabilitation. We disagree.

Toomey urges that the court's decision to decline jurisdiction based explicitly on her pregnancy was wholly irrational. She contends that the record does not suggest any rational basis for considering pregnancy in evaluating her rehabilitative prospects except for Corn's testimony that the juvenile system is not equipped to handle pregnant juveniles.

The juvenile court, however, did not base its decision on the lack of appropriate facilities for pregnant juveniles. Instead, it concluded that Toomey's pregnancy might complicate and hinder the therapy required by a person with her psychological and drug abuse problems. That made it less likely the state could rehabilitate her before her release at 21.

The state has an interest in declining juvenile jurisdiction over one who, upon release, may harm the public. The juvenile system is designed to rehabilitate those juveniles with a likelihood of success, but not those who, upon release, would likely continue to endanger public safety. During the declination hearing, Davis testified that Toomey's pregnancy would cause at least a temporary disruption of any counseling program within the juvenile system. She commented that it was possible that the pregnancy might lengthen the amount of time necessary for Toomey's rehabilitation.

We find that, given her other problems, the court had a rational basis for determining that Toomey's pregnancy could have hindered her rehabilitative treatment. *See United States v. Flores*, 540 F.2d 432, 438 (9th Cir.1976) (holding that preferential treatment based on pregnancy in sentencing decision was rational and within the sound discretion of the court); *see also Jackson Water Works, Inc. v. Public Utils. Comm'n*, 793 F.2d 1090, 1094 (9th Cir.1986) (rational basis standard requires only that there exist "plausible," "argua-ble," or "conceivable" reasons for a classification), *cert. denied*, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987).

## CONCLUSION

We affirm the district court's denial of Toomey's habeas petition without an evidentiary hearing. This case does not involve invidious gender-based discrimination. Toomey's pregnancy was but one element within a broader array of *Kent* factors that the juvenile court examined in declining jurisdiction. Its individualized consideration of the pregnancy in light of her rehabilitative prospects was rationally related to the state's interest in protecting the community. The juvenile court's declination decision withstands scrutiny under the Equal Protection Clause.

AFFIRMED.