Jeffrey WILLIAMS, Petitioner,

v.

George CURRIE, Supt. of Polk Youth Center, Respondent.

No. 1:99CV00930.

United States District Court, M.D. North Carolina.

July 5, 2000.

Walter Lamar Jones, Clifford Clendenin O'Hale & Jones, LLP, Greensboro, NC, for Jeffrey Williams, petitioner.

Clarence Joe Delforge, III, N.C. Department of Justice, Raleigh, NC, for George Currie, respondent.

stead sought wholesale access to all documents produced in discovery.

## MEMORANDUM OPINION
## AND ORDER

ELIASON, United States Magistrate Judge.

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On September 25, 1998, petitioner pled guilty to twenty-three counts of discharging a firearm into an occupied dwelling in cases 98 CRS 577–78, 883–903. Several of these counts were consolidated and petitioner was then sentenced to eleven consecutive terms of 25–39 months active imprisonment. This resulted in a total sentence of roughly 23–36 years. Petitioner did not directly appeal this sentence. However, he did file a motion for appropriate relief in the Superior Court of Rockingham County which was denied on its merits. A certiorari petition to the North Carolina Court of Appeals was summarily denied. Petitioner now turns to this Court for relief with his federal habeas petition.

### Petitioner's Claim

Petitioner's only claim is that his equal protection rights were violated when he was given a lengthy active prison sentence while a similarly situated female co-defendant, who pled guilty to the same charges, received probation. The only issue raised concerns the merits and respondent has requested summary judgment on this claim. The matter is submitted on the record. Neither side has requested an evidentiary hearing.

### Facts

The facts are uncontested and were obtained from the transcript of the plea hearing and sentencing of petitioner and his two co-defendants, Jason Hodge and Jamie Forehand. At the plea hearing, a Rockingham County sheriff's deputy testified that in the early morning hours of January 9, 1998, a number of homes and vehicles were shot into in the Reidsville, North Carolina, area. Tips led detectives to Hodge who gave a statement implicating Forehand and petitioner. Eventually, all three gave statements admitting their guilt in the shootings. There were slight factual differences between the statements.

Hodge initially told police that he was only involved in the first shooting. He said he met petitioner and Forehand in a parking lot where they got into Hodge's car. Petitioner had a .22 caliber rifle and a long clip and asked Hodge to drive to Wanta Peele's house. Peele had been involved in a fight with petitioner's sister in which the sister received a broken nose.[1] Hodge admitted that he drove the car while petitioner fired fifteen to eighteen shots into Peele's house. He also stated that petitioner may have fired at one house before they arrived at Peele's. He did not admit to using the rifle and claimed that he then went home after letting petitioner and Forehand out of the car following the shooting of Peele's house.

Hodge quickly changed this statement and admitted to a much greater level of involvement in the shootings. He stated that he had told the truth about the shooting of Peele's house. However, Hodge admitted that, following the shooting of Peele's house, he, petitioner, and Forehand continued to drive around the area shooting at houses and cars. According to Hodge, they stopped several times to switch positions in the car. Petitioner and Hodge took turns driving, while all three participants took turns riding in the front passenger seat and shooting houses and cars.

Forehand also initially minimized her role in the offense. (Tr. 19) She first told police that it was Hodge who shot at one house before reaching Peele's, that Hodge fired twenty to thirty shots into Peele's house, and that Hodge then shot at another house on the way to petitioner's house

---

1. It appears that petitioner's sister wanted revenge and petitioner felt it was his responsibility to do this for his sister. There is also some indication that the sister was present in another car at the Peele house shooting. (Tr. 16, 19, 23)

where they stopped to get more bullets. She then claimed that after the stop, the three traveled around, but that petitioner and Hodge took turns driving and shooting into around thirty houses and ten cars. She did not admit her involvement and claimed that she stayed in the backseat where she was hit by the shell casings. Forehand concluded by saying that they eventually returned to petitioner's house and that she and petitioner threw the rifle over a bridge the next day. (A rifle was recovered from under the bridge and traced to petitioner's grandfather.)

A few hours after her first statement, Forehand made a second statement admitting her guilt. In the second statement, she confessed that she had shot into ten homes, including a detective's house, and that she thought she had hit three of them. She contended that she had been told to shoot into the detective's house by Hodge, but that he did not tell her it was a detective's house at the time. She also admitted she picked out one of the houses because it belonged to a man who she alleges had raped and burned her with a cigarette lighter three years earlier. Forehand claimed that petitioner did most of the driving and that Hodge showed her how to use the rifle.

Unlike his co-defendants, petitioner made only one statement to police. He readily admitted that he had, at his sister's urging, gotten the rifle and clips and gone with Forehand and Hodge to shoot Peele's house. He admitted that he had shot one house on the way to make sure the rifle would work and that he did the shooting at Peele's house. He stated that the three then traveled about while he or Hodge drove and that all three took turns shooting various houses and cars. Petitioner stated that Hodge laughed about shooting some of the houses and told them that a detective had lived in one of the houses, but did not say which one. After the shootings, petitioner stated he was worried that someone might have been hurt because Hodge shot at windows. Therefore,

he took the rifle, which was hidden in the trunk of his sister's car, and threw the gun over the bridge.

The sentencing court next heard testimony from the victims, accepted the guilty pleas of petitioner and his co-defendants and proceeded to sentencing. At sentencing, none of the accused made significant statements. However, all three introduced or proffered psychological and background evidence as follows.

*Hodge.* A psychological exam found him to be of below average intelligence and to have the social functioning of a twelve-year-old even though he was age 19 at the time of the shootings. He had completed only the ninth grade in school before dropping out, was depressed over domestic problems involving a wife and child, and had consumed over a pint of vodka on the night of the shootings. He worked several jobs after dropping out of school. His only criminal history was a charge stemming from an incident in which he and four other persons broke into a school and vandalized some of the rooms. The psychologist's report indicated that Hodge was a follower rather than a leader and that he was, therefore, unlikely to initiate criminal activity on his own.

*Forehand.* She had tried to kill herself in 1995, had been hospitalized and diagnosed as behaviorally emotionally handicapped, and had then been placed in a structured school where she did very well (getting straight "A's") for a time. Upon her return to Rockingham County, however, Forehand quickly began having discipline and school attendance problems.

A person from a sentencing alternatives group opined that Forehand was intelligent and would not have committed the crimes without peer influence. Forehand had a marijuana abuse problem, was "high" when she did the shooting, and was in need of treatment for that problem. A psychologist concluded that Forehand had a low probability of future violence.

*Petitioner.* A psychologist testified that petitioner had family support from his parents and grandparents, that his parents were divorced, that the divorce had a large impact on petitioner, that petitioner dropped out of school in the ninth grade, and that he spent a year in a group home in Louisiana where he performed well in a structured environment. Petitioner also took Ritalin and Desyrel (an anti-depressant) for a time. Petitioner next lived with his father, worked in a restaurant, and then became employed full time by Radio Shack. He did fairly well at the Radio Shack job, but was fired for not recording customers' names and addresses. Thereafter, he had trouble finding steady employment. Around this same time, a close friend of his was killed in a botched robbery attempt. As a result, petitioner became depressed and began using marijuana, which he continued to use up until the time of the shootings. It was related that petitioner had an average IQ, reads at a high school level or higher, and has decent math skills, but could benefit from education. The psychologist also stated that petitioner was impulsive and that his marijuana use on the night of the shootings would have made it more difficult for him to control his impulses. Finally, the psychologist concluded that petitioner was unlikely to repeat the shootings and recommended that petitioner receive substance abuse treatment, close supervision, and psychiatric medication.

Following this testimony, the sentencing judge took a recess, returned, and handed down the following sentences: Both Forehand and petitioner received the same sentence—eleven prison terms of 25–39 months to run consecutively (approximately 23–36 years). Hodge received eleven consecutive prison terms of 29–44 months (approximately 27–40 years). Hodge received a higher sentence because, unlike petitioner or Forehand, he had a prior criminal conviction. However, without any explanation, Forehand's sentence was suspended and she was placed on probation and given only an eight-month active sentence, which amounted to the time spent in pretrial custody. (Tr. 116) She was also ordered to pay restitution. No explanation was given as to why the males received minimum active sentences of 23 to 27 years and the female only received eight months of time already served.

### Legal Standards

Respondent has submitted the state court records. Neither petitioner nor respondent have submitted affidavits. It appears that all of the facts necessary to decide the case are contained in the state court records. Neither party has requested that the Court expand the record or set the matter for an evidentiary hearing. Nor does it appear that such is necessary. Petitioner requests that respondent's motion for summary judgment be denied and that the Court consider the petition on its merits. Therefore, the Court will decide the matter under Rule 8, Rules Governing Section 2254 Cases.

Under 28 U.S.C. § 2254(d) and (e), this Court's review of habeas petitions is limited. Section 2254(d) states that a writ of habeas corpus shall not be granted as to any claim which a state court adjudicated on the merits unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Williams v. Taylor,* —— U.S. ——, —— 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### Discussion

Petitioner's claim for relief is a simple one. He asserts that his equal protection rights under the Fourteenth Amendment of the United States Constitution were violated because of his gender. He claims he received a significantly harsher total sentence than his similarly situated female

co-defendant for no other reason than his gender is male.

Respondent does not cite or contend that current constitutional authority authorizes criminal defendants to be treated differently based on their gender. Indeed, a review of Supreme Court precedent leads to the opposite conclusion. Moreover, this rule against discrimination is clearly established by Supreme Court precedent.

Starting at a more general level, it has for some time been established that invidious distinctions made by the government based on gender are constitutionally suspect. *See Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (invalidating Idaho law which preferred males over females as estate administrators); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (federal statutes which allowed males, but not females, in the military to claim spouses as dependants were invalid). The Supreme Court has also examined gender discrimination in at least two different contexts relating to criminal law and has concluded that such classifications can violate the Constitution. *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (invalidating Oklahoma law that allowed the sale of 3.2 percent beer to eighteen-to-twenty-year-old females but not eighteen-to-twenty-year-old males); *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (jury selection).

*Craig* held that "previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig* at 197, 97 S.Ct. at 456.[2] Eighteen years later in *J.E.B.,* the Supreme Court, in the context of examining discriminatory use of peremptory challenges, stated that it was reaffirming "what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause." *Id.* at 130, 114 S.Ct. at 1422. The Supreme Court noted that it need not decide whether discrimination based on gender was an inherently suspect classification, but left no doubt that such classification must pass heightened scrutiny by substantially furthering a legitimate government interest. 511 U.S. at 137, 114 S.Ct. 1419.

The import of Supreme Court decisions prohibiting gender discrimination was immediately recognized by the lower federal courts.[3] *United States v. Maples,* 501 F.2d 985, 987 (4th Cir.1974) ("The factor of sex [is] an impermissible one to justify a disparity in sentences."); *Meloon v. Helgemoe,* 564 F.2d 602 (1st Cir.1977), *cert. denied,* 436 U.S. 950, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978) (invalidating statutory rape law where it applied only to males and did not substantially further an important government interest); *Navedo v. Preisser,* 630 F.2d 636 (8th Cir.1980) (invalidating law punishing males who have intercourse with juveniles, but not females).

Therefore, for more than twenty years, the rule against gender discrimination has been clearly established by Supreme Court precedent. The age of these decisions invalidates respondent's argument that, even if petitioner is the victim of gender discrimination, he still would be barred from relief because this would constitute a new rule of constitutional law under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Given that these decisions pre-date petitioner's conviction and

---

2. Although the opinion of the Court in *Craig* was joined by only four justices, its standard was later adopted and applied by a majority of the Supreme Court. *Califano v. Westcott,* 443 U.S. 76, 85, 99 S.Ct. 2655, 2661, 61 L.Ed.2d 382 (1979).

3. Indeed, the Tenth Circuit, based solely on the Fourteenth Amendment, predicted the Supreme Court's decisions. *Lamb v. Brown,* 456 F.2d 18 (10th Cir.1972) (invalidating law where females receive benefit of juvenile proceedings up to 18 years of age while males limited to 16 years).

the broad, plain language of the cases cited above, this argument fails. Rules which are in the "axiomatic" category cannot be considered new or uncertain.

Respondent has not advanced any important governmental objective to support discriminating against petitioner based on his gender. He does assert that there is an important state interest in preferring younger defendants (Forehand who was sixteen) over older defendants (petitioner and Hodge who were nineteen). The argument misses the mark. It attempts to justify distinctions based on age. It has nothing to do with why a distinction based on gender is permissible. The argument is only appropriate at a later stage of the analysis for use in determining whether petitioner's sentences were due to his gender or whether they could be attributed to another, neutral factor, such as age.

■ At this point, it has been shown that invidious gender discrimination violates the Equal Protection Clause of the Fourteenth Amendment. The protection of the clause is "applicable not only to discriminatory legislative action, but also to discriminatory governmental action in the administration and enforcement of the law. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)." *Britton v. Rogers,* 631 F.2d 572, 577 (8th Cir.1980), *cert. denied,* 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981). It clearly covers criminal sentencing.

■ It has by now been well-established that when a person claims invidious discrimination, the claimant must show both that the action (in this case criminal

sentencing) had a discriminatory effect and that it was motivated by a discriminatory purpose. *United States v. Bell,* 86 F.3d 820, 823 (8th Cir.), *cert. denied,* 519 U.S. 955, 117 S.Ct. 372, 136 L.Ed.2d 262 (1996) (race discrimination), *relying on, Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 819 (4th Cir. 1995); *United States v. Maples,* 501 F.2d at 987; *see also Toomey v. Clark,* 876 F.2d 1433, 1437 (9th Cir.1989). To establish discriminatory effect, petitioner must show that the disparity in sentences resulted because he was disfavored for being a male or that females receive favorable treatment based on gender. To show discriminatory purpose, petitioner must show that the decision was based, at least partially, on gender. If petitioner shows both discriminatory effect and purpose, the burden then shifts to the State to show that the same sentencing decision would have occurred even if discriminatory purpose had not been considered. In the end, petitioner bears the burden of showing that gender discrimination was clear and intentional. *Id.*

The problem in any invidious discrimination case, whether it be race or gender, is how to prove discriminatory intent. In *United States v. Maples,* 501 F.2d at 986, the evidence of discrimination was manifest. After the district judge candidly disclosed that, legally, he was not supposed to make a distinction between the sentences of the male and female, he continued: "But I'm old fashioned enough I just don't believe in punishing women who participate in a crime with the men on the same basis as a man."[4] In *Maples,* it is clear

---

4. This expressed feeling of male dominance, culpability, and responsibility versus female submissiveness and innocence is hardly isolated or unique. *See United States v. Redondo-Lemos,* 27 F.3d 439, 443 (9th Cir.1994) (United States Attorney has come to expect that Mexican males stand up and take responsibility), and *United States ex rel. Zembowski v. DeRobertis,* 598 F.Supp. 914, 919 (N.D.Ill. 1984) (attorney breached duty of fair representation by overtly displaying sympathy and favor to female client because he considered

the male client led her astray, and the court itself stated it could not believe that a 24–year–old woman with a 2–3–year–old child instigated the offense, but rather must have been induced by the male, even though the male had a wife and four young children).

Nor is this entrenched attitude concerning males surprising considering the history of different treatment based on gender. For example, in Charles Dickens' early 19th century novel *Oliver Twist,* Mr. Bumble, the parish beadle in charge of the workhouse, and utter-

that the court had before it concrete evidence of gender discrimination.

Not all cases will contain direct evidence of the sentencing motives. At least until recently, sentencing has been almost completely discretionary, and often made without explanation or stated reasons.

Fortunately, the Supreme Court has provided guidance for determining evidentiary sufficiency of discrimination claims in difficult cases where no direct evidence of discrimination can be found. That was the situation before the Supreme Court when it considered a case involving jury selection by the exercise of peremptory challenges. The Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), noted that a single, invidiously discriminatory governmental act is not immunized for lack of finding comparable decisions which establish a pattern of discrimination. 476 U.S. at 96, 106 S.Ct. 1712. Evidence of invidious intent may come from circumstantial evidence which points to discrimination because the decision in question is otherwise difficult to explain as resulting from neutral factors. *Id.* at 93, 106 S.Ct. 1712. In that instance, discrimination is shown through establishing "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose." *Id.* at 93–94, 106 S.Ct. 1712.

In determining whether a defendant has made a prima facie case, the court is entitled to consider all relevant circumstances. In the exercise of peremptory challenges, for example, the court can consider the pattern of strikes, prosecutor questions, and other evidence arising during the selection process. Once a prima facie case is established, the burden then shifts to the state to come forward with a neutral explanation. *Id.* at 97, 106 S.Ct. 1712. Mere denial of discriminatory motive will not be sufficient. Rather, in the case of peremptory challenges, the prosecutor must articulate a neutral reason supporting his or her decision.

*Batson* is also appropriate for this sex discrimination case, inasmuch as the Supreme Court held *Batson* applied to gender discrimination in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89. Finding that these are the proper standards to be applied in petitioner's case, the Court will now turn to evaluating the State court's decision on this matter and then examine the merits of the claim.

Under 28 U.S.C. § 2254, this Court normally gives deference to the state court's adjudication of petitioner's claim on its merits. In this case, there is only one such adjudication—the denial of petitioner's motion for appropriate relief in the Superior Court of Rockingham County. That opinion is not entitled to deference because it summarily discusses the equal protection claim generally, but fails to deal with it at the necessary level of specificity. It rejected petitioner's claim because "there is no requirement that all persons who are involved in the commission of the same offense receive identical punishment." (November 20, 1998 Order) The proposition is not necessarily objectionable,[5] but is not entitled to deference be-

ly dominated by his wife, tried to explain that it was she, not he, who did the criminal act. He was informed that because he was present on the occasion, that he was "the more guilty of the two, in the eye of the law, for the law supposes that your wife acts under your direction" to which Mr. Bumble indignantly and vociferously replied: "If the law supposes that, ... the law is an ass, an idiot." Charles Dickens, *Oliver Twist,* p. 399, Oxford University Press (1949, reprint 1997).

Societal differentiations between the genders have distributed benefits and disadvantages unequally to both sexes. Yet these concepts and conventions, once deemed proper and beneficial, may now be considered discriminatory and such views are constantly being readjusted as society evolves through time.

**5.** Both the state court and respondent here defend the sentencing result in this case, arguing that it is not a violation of the Equal Protection Clause when two co-defendants

cause it fails to address the claim of gender discrimination in sentencing.

■ Turning to the merits of the case, it is again noted that there is no direct evidence of gender discrimination. The sentencing judge simply announced the sentences as to all three defendants without giving any explanation as to the reason for the difference between the sentences.[6] As it turns out, this will be a problem for both parties. Without direct evidence, both parties are left to compare the facts surrounding each defendant and their individual involvement in the crimes to determine whether gender played a part in petitioner's sentencing.

Because petitioner does not have direct evidence of discrimination, he is left to rely on establishing a prima facie case of purposeful discrimination under the mandate of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. To do this, he must show that he was treated more unfavorably, or that the female was treated more favorably than him. 476 U.S. at 96, 106 S.Ct. 1712. Furthermore, he must show that his sentencing operated under a system which permitted those who had a mind to discriminate to do so, whether consciously or unconsciously. *Id.* Last, petitioner must show that these facts, along with other relevant circumstances, raise an inference that the difference in sentencing between the males and the female occurred because of their gender. *Id.* The court is entitled to consider all relevant evidence and circumstances.

In the instant case, petitioner passes the first threshold by showing that he is a male and that he received a substantially harsher[7] sentence than a female co-defendant (23 years versus 8 months). Establishing the second prong of the test could be a little more difficult because North Carolina has circumscribed sentencing discretion through the North Carolina Fair Sentencing Act, N.C.Gen.Stat. § 15A–1340.10, *et seq.* However, as will be seen, and unlike the federal sentencing guidelines, there remain large areas of complete discretion in North Carolina sentencing and, consequently, sentencing in those areas satisfy the second *Batson* test.

North Carolina's Fair Sentencing Act was an attempt to compromise between inflexible presumptive sentences and completely discretionary sentences. *State v. Thompson*, 310 N.C. 209, 311 S.E.2d 866 (1984), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988). Like

are given different sentences. However, no Supreme Court case has been cited. In *Howard v. Fleming*, 191 U.S. 126, 136, 24 S.Ct. 49, 48 L.Ed. 121 (1903), the Supreme Court upheld a sentencing disparity wherein one co-defendant was given ten years and another seven years as not being sufficiently divergent to amount to cruel and unusual punishment, nor to be *such an inequality* as to violate the Equal Protection Clause. Lower courts assume this proposition to be true. *United States v. Baysden*, 326 F.2d 629, 631 (4th Cir.1964); *United States v. Lawrence*, 179 F.3d 343, 348–49 (5th Cir.1999), *cert. denied*, — U.S. —, 120 S.Ct. 836, 145 L.Ed.2d 703 (2000); *Simpson v. United States*, 342 F.2d 643 (7th Cir.1965). Yet, unbridled discretion may be a problem if perceived to be arbitrary and capricious. With the introduction in 1987 of the United States Sentencing Guidelines, there has been a federal attempt to provide a rational basis for differing sentences. Under the Guidelines, disparate sentences among co-defendants are permissible, albeit based on reasons apparent from the record. *See United States v. Perkins*, 108 F.3d 512, 515 (4th Cir.1997).

**6.** The sentencing judge did explain that Hodge's criminal history mandated a sentence for each conviction of 29 to 44 months rather than 23 to 39 months. He did not explain why the female got probation for all of her convictions while Hodge and petitioner received active time.

**7.** Not every minor disparity will meet this test. The differential treatment must rise to a meaningful level. *Contrast Britton v. Rogers*, 631 F.2d 572, 577 (8th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981) (statistical disparity in rape sentences of only a few years) *with Meloon v. Helgemoe*, 564 F.2d 602, 607 (1st Cir.1977), *cert. denied*, 436 U.S. 950, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978) (a far more serious criminal penalty means a "far greater legal differential").

federal sentencing guidelines, in North Carolina there are presumptive terms based on the seriousness of the crime and prior criminal activity. In addition, there are statutory mitigating and aggravating factors which will increase or decrease the sentence within a sentencing level. North Carolina judges must consider the statutory aggravating or mitigating factors and make findings as to them in order to depart from the presumptive sentencing range. *State v. Artis*, 91 N.C.App. 604, 372 S.E.2d 905 (1988). Judges could find that an aggravating factor outweighed numerous mitigating factors and, indeed, could also use non-statutory aggravating or mitigating factors in making a decision.[8] *State v. Nichols*, 66 N.C.App. 318, 311 S.E.2d 38, *rev. denied*, 311 N.C. 406, 319 S.E.2d 278 (1984). More importantly, unlike the federal sentencing guidelines, North Carolina sentencing is vastly discretionary because judges are not limited in any fashion when deciding whether to impose consecutive or concurrent sentences. *See State v. Freeman*, 313 N.C. 539, 330 S.E.2d 465 (1985). Moreover, the range of cases wherein probation or active time can be imposed is greatly expanded over that of federal sentencing guidelines.[9] And, there is no appeal of right unless the sentence is in excess of a presumptive term. *State v. Cain*, 79 N.C.App. 35, 338 S.E.2d 898, *rev. denied*, 316 N.C. 380, 342 S.E.2d 899 (1986).

Petitioner has shown that he received a considerably harsher sentence than a similarly situated female under a sentencing system which is not so tightly controlled so as to reasonably eliminate the possibility that those who are of a mind to discriminate would be able to do so. The final matter then is whether this combination of factors and other circumstances raise an inference of purposeful discrimination.

In the instant case, the stark, gross disparity in sentences, and the other evidence, is sufficient to create such an inference. As noted earlier, there is nothing to distinguish the defendants, except for their age. Although age is a specific mitigating factor under North Carolina's Fair Sentencing Act, N.C.Gen.Stat. § 15A–1340.16(e)(4), it would have to have been specifically noted in written findings. Yet, the sentencing court did not find any mitigating or aggravating factors of any nature. Therefore, in this instance, one is left with a situation where the males were sentenced to 25–36 years and 27–40 years, whereas the female received an eight-month sentence consisting of time already served in jail awaiting sentencing. This is a legally significant disparity. It is sufficient to raise an inference of discrimination.

This inference shifts the burden to the State to come forward with a neutral explanation for the grossly disparate sentencing between the males and the female. *Batson v. Kentucky*, 476 U.S. at 97, 106 S.Ct. 1712. Mere denial of discrimination or assertion of good faith will not be sufficient. *Id.* at 98, 106 S.Ct. 1712. Rather, there must be an articulation of a neutral explanation related to the particular case. *Id.* The State has, in fact, attempted such a rebuttal.

---

**8.** Pursuant to N.C.Gen.Stat. § 15A–1340.16(c), a court need not make written findings with respect to aggravating or mitigating factors unless the sentence departs from the presumptive range.

**9.** Probation is authorized not just for misdemeanors or minor felonies, but up to Class E felonies, as in the instant case, where the minimum imprisonment is 29–36 months and the maximum is 44–53 months. N.C.Gen.Stat. § 15A–1340.17. In contrast, under the United States Sentencing Guidelines, pure probation can be given only for crimes with a sentencing range of 0–6 months. Probation can also be imposed for certain sentences with ranges up to 12 months. However, the probation for these sentences must be completed with conditions of intermittent confinement, community confinement, or home detention. U.S.S.G. § 5B1.1 (1998). And, in North Carolina, this difference is greatly exacerbated, as in the instant case, because the ability to sentence consecutively is completely discretionary.

Respondent has pointed to several possibilities for the disparate sentences. All of them suffer from the same debility. The explanations attempt to show aggravating or mitigating factors which were never found by the sentencing court. Moreover, a close examination of the explanations fails to dispel the inference of discrimination.

First, respondent claims that petitioner and Hodge were more culpable because (1) petitioner provided the rifle and ammunition, (2) Hodge provided the car, (3) only petitioner and Hodge drove during the shootings, (4) Forehand had to be shown how to operate the rifle, and (5) Forehand did not know whose house to shoot into but was simply told " 'Here shoot into this house.' " [10] These points fail for various reasons.

It is true that petitioner provided the rifle and bullets and that Hodge provided the car. However, these were not the criminal acts for which the three defendants were sentenced. They were sentenced for shooting into homes and cars, activities that they all participated in equally. Even if providing the gun and car could make some small difference, it would not justify a 20–30–year difference. Part of the evidence which can be considered is the prosecutor's arguments. The prosecutor, in his final argument to the sentencing judge, did not make a distinction of culpability between the co-defendants and did not raise the furnishing of a gun, or driving the car as potential aggravating factors. Neither did the sentencing court.

Respondent contends that the male co-defendants were more culpable because they educated the female to allow her to commit the crimes. First, only Hodge, not petitioner, taught Forehand how to use the rifle. This fact should have separated Hodge's sentences from the sentences of both petitioner and Forehand, but it did not. Moreover, it is equally valid to say that Forehand is more culpable than Hodge because she actively and willingly learned a new skill for the express purpose of committing a crime that she did not otherwise have the capability to commit.

Respondent's claim that Forehand did not realize whose house she was shooting into is only true to the extent it is true for all three of the defendants as to most of the houses that were shot. All co-defendants knew that Wanta Peele's house was shot into, Hodge knew that a detective's house was shot into, and the female Forehand shot, or caused the others to shoot, into a home belonging to a man who had supposedly injured her three years earlier.

The equal culpability of the three shooters is highlighted by the closing argument of the prosecutor at sentencing. After having heard all of the evidence and considered all of the facts, the prosecutor asked the judge to find several aggravating factors as to all three defendants. He also asked that, as to *Hodge only,* the judge find that shooting into a detective's home was an aggravating factor.[11] He then requested that all three defendants receive consecutive active sentences as to each of the charges. (Tr. at 157)

Respondent's next argument to rebut the inference of gender discrimination is one previously mentioned—the fact that Forehand was younger than her male co-defendants. This is factually correct. Forehand was sixteen at the time of the shootings, while petitioner and Hodge were nineteen. According to respondent, this means that Forehand was a minor, while the two males were adults and this

---

**10.** This house evidently belonged to a law enforcement officer. Only Hodge told Forehand to shoot at that house. The evidence more than amply demonstrates that Forehand not only chose other houses, but deliberately chose the house of a person who she alleges had previously hurt her. Thus, all three co-defendants chose a house to shoot for purposes of revenge.

**11.** This was apparently due to the fact that this home belonged to a law enforcement officer.

alone supports the harsher sentences for the two males. This argument is rejected because respondent's minor/adult distinction does not match with North Carolina criminal law at the time of petitioner's prosecution. As petitioner points out, sixteen year olds are adults for the purposes of criminal law, *citing* N.C.Gen.Stat. §§ 7A–517(20), 7A–524 (1998).[12] And, Forehand was charged and sentenced as an adult.

The argument is further rejected because age is a statutory mitigating factor under N.C.Gen.Stat. § 15A–1340.16(e)(4), but the sentencing court did not find this to be a mitigating factor.[13] Equally important, if the sentencing judge had found this factor as to Forehand and found that, due to the existence of the mitigating factor, Forehand deserved to be sentenced in the mitigated range for her crimes, she would have faced sentences with a minimum range of 15 to 20 months on each count and a maximum range of 27 to 33 months. N.C.Gen.Stat. § 15A–1340.17(c), (e). This would be a minimum possible sentence range of 13–18 years for consecutive sentences. If the sentencing court had taken age into consideration, it would appear that the female would have received an 18–30–year[14] sentence as compared to petitioner's 23–36 years. In other words, petitioner's minimum sentence would have only been about five years greater than the female's. Instead, it was 22 years more. Thus, age cannot be used as a neutral factor completely explaining the difference in the sentences between the males and the female, even if the sentencing court had found age to be a mitigating factor.

In the end, respondent cannot rebut the presumption of discrimination. The only truly noticeable difference between Forehand and her two co-defendants is gender. This record is sufficient to allow a finding that gender discrimination accounts for most, if not all, of the more than twenty-year gap between plaintiff's total sentence and Forehand's total sentence. With plaintiff having established a prima facie case of gender discrimination which serves no government interest at all, and respondent failing to rebut the inference, respondent's motion for summary judgment is denied and the petition is granted.

■ Having found that petitioner's constitutional rights were violated, the Court next determines the appropriate relief in this case. As was pointed out by the Fourth Circuit in *Maples,* perhaps the most just or appropriate remedy, given the nature of the crimes involved, would be to increase Forehand's active prison time so that it more closely resembled the sentences of her male co-defendants. Unfortunately, such a remedy is not possible. *Maples* at 987, *citing, North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). This leaves the Court with the option of ordering the State of North Carolina to either release petitioner with time served constituting his sentence, or to resentence him. If it chooses to resentence petitioner, "the object of the resentencing will, of course, be to eliminate from [petitioner's] term the portion of its length attributable to the fact that [peti-

---

12. The North Carolina legislature repealed the statutes cited by petitioner effective July 1, 1999. Neither party has informed the Court as to the current status of sixteen-year-olds under North Carolina criminal law. However, it makes no difference to petitioner's case given that the law at the time of petitioner's and Forehand's sentencing clearly treated Forehand as an adult.

13. The difference in age could not be used as an aggravating factor to increase petitioner's sentence as respondent argues because that only applies if a co-defendant is *under* the age of 16. N.C.Gen.Stat. § 15A–1340.16. Moreover, there is no evidence that the female was coerced. Instead, the evidence shows she was an instigator by selecting one of the houses.

14. She was sentenced at the high end of the sentence range which, in the hypothetical, converts to 20–33 months × 11 = 18–30 years.

tioner] is male." *Maples* at 987. This is not to say that petitioner must receive exactly the same punishment Forehand received (time served plus supervised probation). However, Forehand's total sentence is a powerful indicator of the appropriate kind of sentence that a defendant should receive for this crime after either eliminating the disadvantage of having petitioner's male gender used against him or else providing him with the same favored status and treatment as if he were female.

**IT IS THEREFORE ORDERED** that respondent's motion for summary judgment be, and the same hereby is, denied.

**IT IS FURTHER ORDERED** that the writ of habeas corpus is hereby issued and that petitioner's sentences in cases of *State v. Williams,* 98 CRS 577–78, 883–903, ordered September 25, 1998 be, and the same hereby are, vacated and set aside and petitioner shall be unconditionally released from custody unless, within 60 days of the date of this order, petitioner is afforded the right to be resentenced or released as set out in the body of this order.

**IT IS FURTHER ORDERED** that, within 10 days after the expiration of the 60–day period, the parties shall inform the Court as to whether there has been compliance with its orders.